# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROSE RICCIO, PAUL MATEER and WILLIAM MITCHELL, on behalf of themselves and all others similarly situated,<br><br> Plaintiffs,<br><br>v.<br><br>HALEON US HOLDINGS LLC d/b/a HALEON,<br><br> Defendant. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 23-CV-13843 |

Plaintiffs, Rose Riccio, Paul Mateer, and William Mitchell on behalf of themselves and all others similarly situated, bring this class action against Defendant, Haleon US Holdings LLC d/b/a Haleon ("Haleon"), and allege on personal knowledge, investigation of counsel, and on information and belief as follows:

## GENERAL ALLEGATIONS

1.      Haleon offers a variety of over-the-counter drugs, including oral nasal decongestants, competing in a billion-dollar industry. Such products include the over-the-counter oral nasal decongestants and pain relievers/fever reducers under the brand names Robitussin, Theraflu, and Contac ("Products"). In the past, each of these brands was manufactured, marketed, and sold by another pharmaceutical manufacturer, but Haleon is the current owner of these brands. Haleon holds all potential liabilities related to the allegations herein, including for the manufacturing, marketing, and sale of the Products prior to the transaction through which Haleon agreed to hold the potential liabilities of the predecessor manufacturers of the Products.

1

2.      All of the Products are oral phenylephrine hydrochloride ("PE") nasal decongestant syrups or tablets, some contain acetaminophen as another active ingredient, and all the Products are marketed as "MAXIMUM STRENGTH," "MAX," and/or "ExpressMAX" (sometimes collectively referred to as the "Maximum Strength Representation").

3.      When consumers purchase decongestants and pain relief/fever reducer pills, the strength of the ingredients is an important purchasing consideration, especially for consumers seeking a maximum strength product.

4.      Haleon takes advantage of this consumer preference for strong relief by prominently representing the alleged strength of the Products in the one place every consumer looks when purchasing a product—the front packaging.

5.      On each product package for the Products, Haleon uniformly touts in capitalized, font set against a contrasting color background on the front of the package the Products provide maximum strength relief.

6.      The Robitussin products that contain PE and/or acetaminophen include: Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flu; Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flu Nighttime; and Adult MAXIMUM STRENGTH – Severe Multi-Symptom Cough Cold + Flue – Day and Night Value Pack (collectively, "Robitussin Products").[1] They are marketed as "MAXIMUM STRENGTH" and "MAX" relief for "Sore Throat," "Nasal Congestion," "Runny Nose," "Body Aches," and "Fever."

---

[1] Based upon reasonable investigation, Plaintiffs have identified certain Robitussin Products that contain PE, and at times, acetaminophen, and are also labeled as "MAXIMUM STRENGTH" and "MAX." The complete list of Robitussin Products is in the exclusive control of Haleon and will be the subject of discovery. Robitussin Products includes all substantially similar Robitussin products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAXIMUM STRENGTH" and "MAX."









4



## Drug Facts

**Active ingredients (in each 20 ml)**      **Purposes**

Acetaminophen, USP 650 mg ......................... Pain reliever/Fever reducer
Dextromethorphan HBr, USP 20 mg ........................................ Cough suppressant
Guaifenesin, USP 400 mg .............................................................. Expectorant
Phenylephrine HCl, USP 10 mg ..................................... Nasal decongestant

### Uses

- temporarily relieves these symptoms occurring with a cold or flu:
  - cough due to minor throat and bronchial irritation
  - nasal congestion
  - sinus congestion and pressure
  - minor aches and pains
  - sore throat
  - headache
- temporarily reduces fever
- helps loosen phlegm (mucus) and thin bronchial secretions to drain bronchial tubes and make coughs more productive

### Warnings

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 6 doses in any 24-hour period, which is the maximum daily amount
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Allergy alert:** acetaminophen may cause severe skin reactions.
Symptoms may include:
- skin reddening
- blisters
- rash
If a skin reaction occurs, stop use and seek medical help right away.
**Sore throat warning:** If sore throat is severe, persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea, or vomiting, consult a doctor promptly.

**Do not use**
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen ask a doctor or pharmacist.

**Ask a doctor before use if you have**
- liver disease
- heart disease
- high blood pressure
- thyroid disease
- diabetes
- trouble urinating due to an enlarged prostate gland
- cough that occurs with too much phlegm (mucus)
- a breathing problem or chronic cough that lasts or as occurs with smoking, asthma, chronic bronchitis, or emphysema

**Ask a doctor or pharmacist before use if you are**
- taking the blood thinning drug warfarin
- taking any other oral nasal decongestant or stimulant
- taking any other pain reliever/fever reducer

**When using this product do not use more than directed**

**Stop use and ask a doctor if**
- you get nervous, dizzy, or sleepless
- pain, cough, or nasal congestion gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- new symptoms occur
- cough comes back or occurs with rash or headache that lasts. These could be signs of a serious condition.

**If pregnant or breast-feeding,** ask a health professional before use.
**Keep out of reach of children.** In case of overdose, get medical help or contact a Poison Control Center right away. Prompt medical attention is critical for adults as well as for children, even if you do not notice any signs or symptoms.

### Directions

- do not take more than 6 doses in any 24-hour period
- do not exceed recommended dosage. Taking more than the recommended dose (overdose) may cause serious liver damage.
- measure only with dosing cup provided
- keep dosing cup with product
- ml = milliliter
- this adult product is not intended for use in children under 12 years of age

| age | dose |
| --- | --- |
| adults and children 12 years and over | 20 ml every 4 hours |
| children under 12 years | do not use |

### Other information

- **each 20 ml contains:** sodium 14 mg
- store at 20-25°C (68-77°F)

### Inactive ingredients

anhydrous citric acid, edetate disodium, FD&C red no. 40, glycerin, menthol, natural and artificial flavors, polyethylene glycol, propyl gallate, propylene glycol, purified water, sodium benzoate, sodium citrate, sorbitol solution, sucralose, triacetin, xanthan gum

### Questions or comments?

call weekdays from 9 AM to 5 PM EST at **1-800-762-4675**

---

7.     The Theraflu products that contain PE and/or acetaminophen include: ExpressMax Nighttime Severe Cold & Cough Syrup, ExpressMax Daytime Severe Cold & Cough Syrup, and ExpressMax Severe Cold & Flu Syrup (collectively, "Theraflu Products").[2] They are marketed as

---

[2] Based upon reasonable investigation, Plaintiffs have identified certain Theraflu Products that contain PE, and at times, acetaminophen, and are also labeled as "ExpressMax." The complete list of Theraflu Products is in the exclusive control of Haleon and will be the subject of discovery. Theraflu Products includes all substantially similar Theraflu products, manufactured, marketed,

"ExpressMax" relief for "Nasal Congestion," "Sore Throat Pain," "Runny Nose," "Headache," "Body Ache," and/or "Fever."





and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "ExpressMax" or with another synonymous Maximum Strength Representation.

7





 

8.    The Contac products that contain PE and/or acetaminophen include: Contac Cold + Flu Maximum Strength Multi-Symptom Relief - Day, Contac Cold + Flu Maximum Strength Multi-Symptom Relief - Night, and Contac Cold + Flu Maximum Strength Multi-Symptom Relief Day/Night (collectively, "Contac Products").[3] They are marketed as "MAXIMUM STRENGTH" relief for "Nasal Congestion," "Sinus Pressure," "Sore Throat," "Runny Nose," "Head & Body

---

[3] Based upon reasonable investigation, Plaintiffs have identified certain Contac Products that contain PE, and at times, acetaminophen, and are also labeled as "MAXIMUM STRENGTH." The complete list of Contac Products is in the exclusive control of Haleon and will be the subject of discovery. Contac Products includes all substantially similar Contac products, manufactured, marketed, and sold during the relevant class periods, that contained PE and acetaminophen were labeled as "MAXIMUM STRENGTH."

9

Aches," and "Fever."



### Drug Facts

**Active ingredients (in each caplet)**    **Purpose**

Acetaminophen 500mg. . . . . . . . . . . . Pain reliever/fever reducer
Phenylephrine hydrochloride 5mg . . . . . . . . . Nasal decongestant

**Uses** Temporarily relieves common cold/flu symptoms:
- nasal congestion
- headache
- minor aches and pains
- stuffy nose
- sinus congestion and pressure
- sore throat
- fever

**Warnings**

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take
- more than 8 caplets in 24 hours, which is the maximum daily amount
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Sore throat warning:** If sore throat is severe, persists for more than 2 days, occurs with or is followed by fever, headache, rash, nausea, or vomiting, ask a doctor promptly.

**Do not use**
- with any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- if you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product. ►

### Drug Facts (continued)

**Ask a doctor before use if you have**
- liver disease
- heart disease
- trouble urinating due to an enlarged prostate gland
- diabetes
- high blood pressure
- thyroid disease

**Ask a doctor or pharmacist before use if you are**
- taking the blood thinning drug warfarin

**When using this product**
- do not exceed recommended dosage

**Stop use and ask doctor if**
- pain or nasal congestion gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- you get nervous, dizzy, or sleepless
- new symptoms occur

**If pregnant or breast-feeding,** ask a health professional before use.

**Keep out of reach of children.**

**Overdose warning:** Taking more than the recommended dose can cause serious health problems. In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms. ▼

### Drug Facts (continued)

**Directions**
- Do not take more than directed (see overdose warning).
- Adults and children 12 years of age and over: take 2 caplets every 6 hours as needed.
- Do not take more than 8 caplets in 24 hours.
- Children under 12 years of age: ask a doctor. ►

### Drug Facts (continued)

**Other information**    store at 20°-25°C (68°-77°F)

**Inactive ingredients** corn starch, microcrystalline cellulose, polyethylene glycol, polysorbate 80, polyvinyl alcohol, potassium sorbate, povidone, sodium lauryl sulfate, stearic acid, talc.

**Questions or comments?**
Call toll free 1-855-874-0970 (English/Spanish) weekdays



## Drug Facts

**Active ingredients for Night Formula** — **Purpose**
**(in each caplet)**

**Acetaminophen 500mg** . . . . . . . . Pain reliever/fever reducer
Chlorpheniramine maleate 2mg . . . . . . . . . . . Antihistamine
Phenylephrine hydrochloride 5mg . . . . . Nasal decongestant

**Uses** temporarily relieves common cold/flu symptoms:
- nasal congestion
- headache
- runny nose
- sore throat
- minor aches and pains
- sneezing
- temporarily reduces fever

## Warnings

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take:
- More than 8 caplets in 24 hours, which is the maximum daily amount.
- With other drugs containing acetaminophen.
- 3 or more alcoholic drinks every day while using this product.

**Sore throat warning:** If sore throat persists for more than 2 days, is accompanied or followed by fever, headache, rash, nausea or vomiting, ask a doctor promptly.

**Do not use:**
- With any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- If you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains an MAOI, ask a doctor or pharmacist before taking this product.

**Ask a doctor before use if you have:**
- liver disease
- heart disease
- glaucoma
- high blood pressure
- thyroid disease
- diabetes
- trouble urinating due to an enlarged prostate gland
- a breathing problem such as emphysema or chronic bronchitis

## Drug Facts (continued)

**Ask a doctor or pharmacist before use if you are taking:**
- the blood thinning drug warfarin
- sedatives or tranquilizers

**When using this product:**
- **Do not exceed recommended dosage.**
- Drowsiness may occur.
- Avoid alcoholic drinks.
- Excitability may occur, especially in children.
- Alcohol, sedatives, and tranquilizers may increase drowsiness.
- Be careful when driving a motor vehicle or operating machinery.

**Stop use and ask a doctor if:**
- Pain or nasal congestion gets worse or lasts more than 7 days.
- Fever gets worse or lasts more than 3 days.
- Redness or swelling is present.
- You get nervous, dizzy, or sleepless.
- Any new symptoms occur.

**If pregnant or breast-feeding,** ask a health professional before use.

**Keep out of reach of children.**

**Overdose warning:** Taking more than the recommended dose can cause serious health problems. In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

## Directions:
- Do not take more than directed (see overdose warning).
- Adults and children 12 years of age and over: take 2 caplets every 6 hours as needed.
- Do not take more than 8 caplets in 24 hours.
- Children under 12 years of age: ask a doctor.

**Other information:**
- store at 20°-25°C (68°-77°F)

**Retain outer carton for complete directions and warnings.**



## Drug Facts

| Active ingredients for Day Formula (in each caplet) | Purpose |
|---|---|
| Acetaminophen 500mg | Pain reliever/fever reducer |
| Phenylephrine hydrochloride 5mg | Nasal decongestant |

| Active ingredients for Night Formula (in each caplet) | Purpose |
|---|---|
| Acetaminophen 500mg | Pain reliever/fever reducer |
| Chlorpheniramine maleate 2mg | Antihistamine |
| Phenylephrine hydrochloride 5mg | Nasal decongestant |

**Uses** Temporarily relieves common cold/flu symptoms:
- nasal congestion
- headache
- minor aches and pains
- stuffy nose
- sinus congestion and pressure
- sore throat
- fever
- sneezing (Night formula only)
- runny nose (Night formula only)

### Warnings

**Liver warning:** This product contains acetaminophen. Severe liver damage may occur if you take:
- more than 8 caplets in 24 hours, which is the maximum daily amount
- with other drugs containing acetaminophen
- 3 or more alcoholic drinks every day while using this product

**Sore throat warning:** If sore throat is severe, persists for more than 2 days, occurs with or is followed by fever, headache, rash, nausea, or vomiting, ask a doctor promptly.

**Do not use**
- With any other drug containing acetaminophen (prescription or nonprescription). If you are not sure whether a drug contains acetaminophen, ask a doctor or pharmacist.
- If you are now taking a prescription monoamine oxidase inhibitor (MAOI) (certain drugs for depression, psychiatric, or emotional conditions, or Parkinson's disease), or for 2 weeks after stopping the MAOI drug. If you do not know if your prescription drug contains a MAOI, ask a doctor or pharmacist before taking this product.

## Drug Facts (continued)

**Ask a doctor before use if you have**
- liver disease
- heart disease
- thyroid disease
- trouble urinating due to an enlarged prostate gland
- diabetes
- high blood pressure
- glaucoma (Night formula only)
- a breathing problem such as emphysema or chronic bronchitis (Night formula only)

**Ask a doctor or pharmacist before use if you are**
- taking the blood thinning drug warfarin
- taking sedatives or tranquilizers (Night formula only)

**When using this product:**
- do not exceed recommended dosage
- for Night formula only:
  - drowsiness may occur
  - avoid alcoholic drinks
  - alcohol, sedatives and tranquilizers may increase drowsiness
  - be careful when driving a motor vehicle or operating machinery
  - excitability may occur, especially in children

**Stop use and ask a doctor if:**
- pain or nasal congestion gets worse or lasts more than 7 days
- fever gets worse or lasts more than 3 days
- redness or swelling is present
- you get nervous, dizzy or sleepless
- new symptoms appear

**If pregnant or breast-feeding,** ask a health professional before use.

**Keep out of reach of children.**

**Overdose warning:** Taking more than the recommended dose can cause serious health problems. In case of overdose, get medical help or contact a Poison Control Center right away. Quick medical attention is critical for adults as well as for children even if you do not notice any signs or symptoms.

*Retain outer carton for complete directions and warnings.*

9. Reasonable consumers understand the Maximum Strength Representations to mean that the Products are the strongest over-the-counter nasal decongestant and pain reliever/fever reducers.

10. Therefore, Haleon's labeling of the Products with a Maximum Strength Representation misleads reasonable consumers as Haleon knew the active nasal decongestant ingredient, PE, was not as strong as other over-the-counter oral nasal decongestants available to consumers and, therefore, not suitable for a maximum strength representation. Additionally, the Products do not even contain the maximum dosage of acetaminophen. And are thus not deserving of the "MAXIMUM STRENGTH," "MAX," or "EXPRESS MAX" label and representation.

11. Thus, this maximum strength packaging is misleading because nasal decongestants that are actually stronger—without the maximum strength claim—are available over the counter. For example, both oxymetazoline and pseudoephedrine are both available over the counter.

12. Further, Haleon knew higher doses of acetaminophen exist on the market. The Court need look no further than the common manufacturing and marketing of acetaminophen products as "Regular Strength" for 325 mg and "Extra Strength" for 500 mg capsules, tablets, and gelcaps, taken, as with the Products, in dosages of two each. For liquid Products at issue, the dosage is 650 mg.

13. Despite this knowledge, Haleon chose to mislead consumers through its labeling of the Products, with and without acetaminophen, as "MAXIMUM STRENGTH," "MAX," and "EXPRESSMAX" decongestants and/or pain relievers/fever reducers. However, none of the Products are maximum strength. Consumers, including Plaintiffs, lack the scientific knowledge necessary to determine whether the Products are maximum strength decongestants and pain relievers/fever reducers, or to ascertain the true quality or strength of these Products. For that

reason, reasonable consumers must and do rely on manufacturers, like Haleon, to be honest and transparent and to properly disclose on the packaging all material information regarding the Products and strength.

14.     Rather than being honest and transparent, Haleon makes the Maximum Strength Representation in a knowingly false, misleading and deceptive manner.

15.     For all the reasons set forth herein, including, but not limited to, Haleon's misrepresentations and omissions regarding its maximum strength claims, Plaintiffs seek relief in this action individually, and as a class action on behalf of similarly situated purchasers of Haleon's Products, for: (1) violation of State consumer protection laws; (2) unjust enrichment, and (3) breach of express and implied warranties.

## **THE PARTIES**

16.     Plaintiff Riccio is a citizen of Illinois, residing in the Village of Niles, within Cook County. She purchased Robitussin Severe Multi-Symptom Cough, Cold + Flu within the applicable statute of limitations period, most recently in 2023 in Illinois.

17.     Plaintiff Mateer is a citizen of Illinois, residing in the Village of Lombard, within DuPage County. He purchased CONTAC Cold + Flu Maximum Strength Multi-Symptom Relief – Day Caplets and Theraflu Daytime ExpressMax Severe Cold & Cough, Berry within the applicable statute of limitations period, most recently in 2023 in Illinois.

18.     Plaintiff Mitchell is a citizen of Illinois, residing in the City of Hometown, within Cook County. He purchased CONTAC Cold + Flu Maximum Strength Multi-Symptom Relief – Day Caplets within the applicable statute of limitations period, most recently in 2023 in Illinois.

19.     Haleon is a Delaware limited liability company with its principal place of business in New Jersey. Haleon's sole member is Haleon PLC, which is incorporated in Delaware and,

therefore, Haleon is a resident and citizen of New Jersey.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Haleon in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Haleon has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold the Products in this state, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiffs and the putative class members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Haleon was engaged in business activities in the state of Illinois.

17.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiffs and Haleon are citizens of different states.

18.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Haleon conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Furthermore, Plaintiffs reside in this District.

## **FACTS COMMON TO ALL CLASS MEMBERS**

20.     Haleon is one of the largest drug manufacturing companies in the world. As such, Haleon sells several over-the-counter drugs, including the "Robitussin," "Theraflu," and "Contac" branded lines of products.

21.     PE is the oral active ingredient in the Products for nasal decongestion. Acetaminophen is the active ingredient in the Products that are the subject of this action as a pain reliever/fever reducer. When included, both form the basis for Haleon's Maximum Strength Representation on the Products' packaging, and overall advertising and marketing campaign.

22.     At all relevant times, Haleon or its predecessors for whom it has agreed to take on liabilities (Pfizer, Inc. and GlaxoSmithKline Consumer Healthcare Holdings (US) LLC), have marketed the Products in a consistent and uniform manner nationwide.

23.     As alleged above, the Robitussin Products represent that they are "MAXIMUM STRENGTH" and "MAX," which representations prominently appear on the front label of the Robitussin Products in capitalized, white font set against a red background that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiffs and class members.

24.     As alleged above, the Theraflu Products represent they are "ExpressMax," which representation prominently appears on the front label of the Theraflu Products in capitalized, red font bordered with white set against a blue background that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiffs and class members.

25.     As alleged above, the Contac Products represent they are "MAXIMUM STRENGTH," which representation prominently appears on the front label of the Contac Products

in capitalized, white font set against a blue background that contrasts with the background of the packaging. This instantly catches the eye of all reasonable consumers, including Plaintiffs and class members.

26.     A reasonable consumer would understand that "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX" means the Products contain the strongest nasal decongestant available on the over-the-counter market, as well as the strongest dose of acetaminophen for pain relief/fever reducer, where applicable.

27.     All reasonable consumers, including Plaintiffs, read and relied on Haleon's "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX" representations when purchasing the Products. Indeed, when purchasing pharmaceuticals, especially those promising to be maximum strength, consumers look for a product with the strongest active ingredients available and are willing to pay a premium for them.

28.     Haleon's Maximum Strength Representation was material to Plaintiffs' and class members' decision to purchase the Products. Had consumers, such as Plaintiffs, known the Products were not "MAXIMUM STRENGTH," "MAX," and "ExpressMax," because stronger over-the-counter alternatives existed, they would not have purchased the Products or would have paid less.

29.     Haleon's marketing efforts are made in order to—and do in fact—induce consumers to purchase the Products at a premium because consumers believe they are getting maximum strength decongestants. This deceives reasonable consumers into believing PE nasal decongestants are maximum strength when they are not.

30.     Haleon, however, has at all relevant times been well aware that its Products are not maximum strength nasal decongestants, as other, stronger nasal decongestants are available with

17

stronger active ingredients, such as pseudoephedrine, over the counter.

31.     Reliable scientific studies undermine PE's effectiveness when compared to other nasal decongestants, thus rendering its Maximum Strength Representation false and misleading in the face of such evidence, and no reasonable consumer would deem the Products maximum strength.

32.     Regardless of a handful of clinical studies addressing PE's efficacy, PE's effectiveness has been questioned when compared to other over-the-counter nasal decongestants.

33.     "Intervention studies can be placed on a continuum, with a progression from efficacy trials to effectiveness trials. Efficacy can be defined as the performance of an intervention under ideal and controlled circumstances, whereas effectiveness refers to its performance under 'real world' conditions."[4]

34.     Further, comparative studies in drugs are designed to improve the health care decisions by providing evidence regarding effectiveness, benefits, and harms of different treatments.[5]

35.     In 2006, the authors of a research comparative letter to the editor of a scientific journal found pseudoephedrine superior to PE in reducing nasal congestion, attributing the ineffectiveness to poor bioavailability of PE.[6]

36.     Also, in 2009, a comparison effectiveness study was done on PE and pseudoephedrine. The authors found that pseudoephedrine was far more effective on the measures

---

[4] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3912314/. Last visited December 19, 2023.
[5]     *See*     https://tracs.unc.edu/index.php/services/comparative-effectiveness-research/what-is-cer#:~:text=Comparative%20effectiveness%20research%20is%20designed,harms%20of%20different%20treatment%20options. Last visited December 19, 2023.
[6]     *See*     https://www.jacionline.org/action/showPdf?pii=S0091-6749%2806%2900633-6.     Last visited December 19, 2023.

of nasal congestion than PE.[7]

37.　　Further, the Maximum Strength Representation on the Products' labels is misleading for yet another reason. The only active ingredient for pain relief/fever reducer is 325 mg of acetaminophen, which is the equivalent of a "Regular Strength" acetaminophen tablet. Thus, the strength of the acetaminophen dosage is far below anything that can be considered "MAXIMUM STRENGTH," MAX," or "ExpressMax," or as acetaminophen is commonly marketed as "Extra Strength."

38.　　Haleon intended for Plaintiffs and class members to be deceived or misled by its misrepresentations and omissions. Indeed, label space is limited, so manufacturers only place the most pertinent information on the front label. Haleon specifically labeled and marketed the Products as Maximum Strength when other oral nasal decongestants and pain relievers/fever reducers were not marketed in a similar fashion.

39.　　Haleon's deceptive and misleading practices proximately caused harm to Plaintiffs and the Classes.

40.　　Plaintiffs and class members would not have purchased the Products, or would have paid less for them, had they known the truth about the mislabeled and falsely advertised products. Indeed, other, stronger nasal decongestants and higher acetaminophen doses are available.

## PLAINTIFFS' FACTUAL ALLEGATIONS

41.　　Plaintiffs relied on the "MAXIMUM STRENGTH," "MAX," and "ExpressMax" label in deciding to purchase what they believed to be the strongest nasal decongestant over the counter. Had Plaintiffs known that PE, the only active oral nasal decongestant ingredient in the Products, is not the maximum strength nasal decongestant available over the counter, they would

---

[7] *See* https://pubmed.ncbi.nlm.nih.gov/19230461/. Last visited December 19, 2023.

not have purchased it or would have paid less. Further, had they known the acetaminophen in the Products was not the maximum dosage available, they would not have purchased it or would have paid less.

42.     Plaintiff Riccio resides in Village of Niles, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased certain of the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, Haleon's "MAXIMUM STRENGTH" and "Max" representations. Specifically, Plaintiff Riccio purchased Robitussin Maximum Strength Severe Multi-Symptom Cough, Cold + Flu CF MAX from a local Walgreens and Jewel Osco located near her home in within Village of Niles, Illinois as recently as six months ago. At the time of purchase, Plaintiff Riccio reviewed the Product packaging, including the front-label "MAXIMUM STRENGTH" and "MAX" representations, and reasonably believed from these representations that the Products were maximum strength. Those terms meant to Plaintiff Riccio that no stronger alternative over-the-counter nasal decongestant and pain reliever/fever reducer existed. In reasonable reliance on these representations, Plaintiff paid a premium for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAXIMUM STRENGTH" and "MAX" representation on the Products' packaging was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Maximum Strength Representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that Haleon did not keep. Had Plaintiff been aware that the Maximum Strength Representations made on the Products were untrue, she would have paid less for the Products, or would not have purchased them at all.

43.     Plaintiff Mateer resides in Village of Lombard, Illinois and is a citizen of Illinois.

Throughout the relevant period, Plaintiff purchased certain of the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, Haleon's "MAXIMUM STRENGTH" and "ExpressMax" representations. Specifically, Plaintiff purchased CONTAC Cold + Flu Maximum Strength Multi-Symptom Relief - Day Caplets and Theraflu Daytime Express Max Severe Cold & Cough, Berry from a local Walmart in the Village of Glen Ellyn, Illinois and/or at a Jewel Osco in the City of Wheaton, Illinois, located near his home in within Village of Lombard, Illinois as recently as four months ago. At the time of purchase, Plaintiff Mateer reviewed the Product packaging, including the front-label "MAXIMUM STRENGTH" and "ExpressMax" representations, and reasonably believed from these representations that the Products were maximum strength. Those terms meant to Plaintiff Mateer that no stronger alternative over-the-counter nasal decongestant and pain reliever/fever reducer existed. In reasonable reliance on these representations, Plaintiff paid a premium for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAXIMUM STRENGTH" and "ExpressMax" representation on the Products' packaging was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Maximum Strength Representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that Haleon did not keep. Had Plaintiff been aware the Maximum Strength Representations made by Haleon on the Products were untrue, he would have paid less for the Products, or would not have purchased them at all.

44.     Plaintiff Mitchell resides in City of Hometown, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff purchased certain of the Products at issue in this lawsuit and was exposed to, and reasonably relied upon, Haleon's "MAXIMUM STRENGTH"

representations. Specifically, Plaintiff purchased CONTAC Cold + Flu Maximum Strength Multi-Symptom Relief - Day Caplets from a local Walgreens in the City of Hometown, Illinois and/or at a Jewel Osco in the City of Burbank, Illinois, located near his home in within City of Hometown, Illinois as recently as the spring of 2023. At the time of purchase, Plaintiff reviewed the Product packaging, including the front-label "MAXIMUM STRENGTH" representation, and reasonably believed from these representations that the Products were maximum strength. That term meant to Plaintiff Mitchell that no stronger alternative over-the-counter nasal decongestant existed. In reasonable reliance on these representations, Plaintiff paid a premium for the Products, which were worth less than represented because the statements were not true and were highly misleading. The "MAXIMUM STRENGTH" representation on the Products' packaging, was part of the basis of the bargain in that Plaintiff attributed value to those representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if he knew the Maximum Strength Representations were untrue and/or misleading. Plaintiff paid a price premium for empty promises that Haleon did not keep. Had Plaintiff been aware the Maximum Strength Representations made by Haleon on the Products were untrue, he would have paid less for the Products, or would not have purchased them at all.

## FED. R. CIV. P. 9(B) ALLEGATIONS

45.     Haleon made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that they are "MAXIMUM STRENGTH," "MAX," and "ExpressMax" decongestant and pain relief/fever reducer products.

46.     Haleon's alleged conduct was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products are maximum strength oral nasal decongestant products. Haleon omitted from Plaintiffs and class members that the Products are not

maximum strength oral nasal decongestant products because other stronger over-the-counter nasal decongestant products exist. Haleon knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Haleon has and continues to represent the Products are maximum strength oral nasal decongestant products when they are not and has omitted from the Products' packaging the fact that there are other over-the-counter products that are stronger decongestants. Haleon has likewise continued to label the Products as maximum strength with respect to pain relief/fever reducer even though their acetaminophen content is only regular strength.

47.     Haleon made material misrepresentations and/or omissions detailed herein, including that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer, continuously throughout the applicable class period(s).

48.     Haleon's material misrepresentations and omissions, that the Products are maximum strength oral nasal decongestant and pain reliever/fever reducer products, were located on the front label of the Products in capitalized, bold lettering that contrasts with the background of the packaging, which instantly catches the eye of all reasonable consumers, including Plaintiffs and class members, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores in Illinois and nationwide.

49.     Haleon made written misrepresentations of fact on the front label of the Products that they were "MAXIMUM STRENGTH," "MAX," and "ExpressMax," even though other stronger nasal decongestant and body pain reliever/fever reducer products are available. As such, Haleon's Maximum Strength Representations are false and misleading. Moreover, Haleon omitted from the Products' labeling the fact that there are stronger over-the-counter nasal decongestants and pain relievers/fever reducers available. And as alleged in detail throughout this Complaint,

Plaintiffs and class members read and relied on Haleon's Maximum Strength Representations and omissions before purchasing the Products.

50.     Haleon misrepresented its Products as being maximum strength nasal decongestant and pain reliever/fever reducer and omitted from the Products' labeling the fact that there are other, over-the-counter products available that are stronger decongestants and pain relievers/fever reducers, for the express purpose of inducing Plaintiffs and class members to purchase the inferior PE and acetaminophen products at a price premium. As such, Haleon profited by selling the misrepresented products to at least thousands of consumers throughout the nation.

## **CLASS ACTION ALLEGATIONS**

51.     Plaintiffs bring this action on behalf of themselves and the following "Classes" pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **Nationwide Class**: All persons in the United States who purchased one or more of the Products in the United States for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

> **Illinois Subclass**: All persons in the State of Illinois who purchased one or more of the Products in the State of Illinois for personal use and not for resale during the applicable statute of limitations period, until the date notice is disseminated.

> **Multi-State Consumer Protection Class:** All persons who purchased in the State of Illinois or any state with similar laws[8] one or more of the Products, within the applicable statute of limitations, until the date notice is disseminated.

52.     Excluded from the Classes are (a) any person who purchased the Products for resale

---

[8] While discovery may alter the following, Plaintiffs assert that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: California (Cal. Bus. & Prof. Code § 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.); *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

and not for personal or household use, (b) any person who signed a release of Haleon in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of Haleon or any entity in which a Haleon has a controlling interest, (d) any legal counsel or employee of legal counsel for Haleon, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

53.     Plaintiffs reserve the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

54.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class members are so numerous and geographically dispersed that joinder of all class members is impracticable. While the exact number of class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands or millions, of putative class members.

55.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all class members and predominate over any questions affecting only individual class members. These common legal and factual questions include, but are limited to, the following:

a. Whether Haleon made the "MAXIMUM STRENGTH," "MAX," and "ExpressMax" representations;

b. Whether Haleon promoted the Products with false and misleading statements of fact and material omissions;

c. Whether Haleon's "MAXIMUM STRENGTH," "MAX," and "ExpressMax" representations are deceptive, unfair, or misleading to the reasonable consumer;

d. Whether Haleon's actions and/or omissions violate applicable laws;

e. Whether Plaintiffs and putative members of the Classes have suffered loss of monies

25

or property or other value as a result of Haleon's acts, omissions, or misrepresentations of material facts;

f.   Whether Haleon was unjustly enriched at the expense of Plaintiffs and members of the putative Classes in connection with the Products;

g.   Whether Haleon breached warranties owed to Plaintiffs and members of the putative Classes;

h.   Whether Plaintiffs and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

i.   Whether Plaintiffs and members of the putative Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

56.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the absent class members in that Plaintiffs and the class members each purchased and used the Products and each sustained damages arising from Haleon's wrongful conduct, as alleged more fully herein. Plaintiffs share the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiffs and all members of the putative Classes have been similarly affected by Haleon's common course of conduct alleged herein. Plaintiffs and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Haleon's false and deceptive "MAXIMUM STRENGTH," "MAX," and "ExpressMax" representations about the Products, as alleged herein.

57.   **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further,

Plaintiffs and their counsel are committed to the vigorous prosecution of this action. Plaintiffs do not have any conflicts of interest or interests adverse to those of putative Classes.

58.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Haleon has acted or refused to act on grounds generally applicable to Plaintiffs and all members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

59.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a.  The damages suffered by each individual member of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Haleon's conduct;

b.  Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c.  The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d.  Individual joinder of all members of the Classes is impracticable;

e.  Absent a class, Plaintiffs and members of the putative Classes will continue to suffer harm as a result of Haleon's unlawful conduct; and

f.  This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the putative Classes can seek redress for the harm caused by Haleon.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
**(By Plaintiffs on Behalf of the Illinois Subclass)**

60.     Plaintiffs reallege paragraphs 1-59 above as if fully set forth herein.

61.     Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass.

62.     The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

63.     Plaintiffs and the Illinois Subclass members were injured by Haleon's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiffs and the Illinois Subclass. Because Plaintiffs and the Illinois Subclass members relied on Haleon's misrepresentations, concealments and omissions when purchasing the Products, they were injured at the time of purchase.

64.     Haleon does business in Illinois, sells and distributes the Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

65.     The Products purchased by Plaintiffs and the Illinois Subclass members were "consumer items" as that term is defined under the ICFA.

66.     Haleon engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat.

28

505/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Haleon as set forth above concerning its Products, which has caused damage and injury to Plaintiffs and the Illinois Subclass members. Plaintiffs and the Illinois Subclass members were injured by Haleon's unfair and deceptive acts at the time of purchasing the Products.

67. Haleon's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX" decongestant or pain reliever/fever reducer.

68. Haleon engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

69. Haleon engaged in misleading and deceptive advertising that represented that the Products were maximum strength. Haleon chose to package and market the products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the products would be impacted by its omissions and would reasonably believe Haleon's false and misleading Maximum Strength Representations and omissions.

70. Haleon's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

71. Haleon intended Plaintiffs and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

72. Haleon's deceptive acts proximately caused actual injury and damage to Plaintiffs and the Illinois Subclass members at the time of purchase.

73. Plaintiffs and the Illinois Subclass members would not have purchased, or would have paid less for, the Products but for Haleon's material misrepresentations as described in this Complaint.

<u>COUNT VI</u>
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(By Plaintiffs on Behalf of the Illinois Subclass)**

74.     Plaintiffs reallege paragraphs 1-59 above as if fully set forth herein.

75.     Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass.

76.     The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq*., prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

77.     815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

78.     Haleon's marking of the Products violates this prohibition by deceiving consumers into believing each of the Products is a "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX" decongestant or pain reliever/fever reducer.

79.     Haleon engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or of misunderstanding in violation of the Act.

80.     Haleon engaged in misleading and deceptive advertising that represented that the Products were maximum strength. Haleon chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all

consumers who purchased the Products would be impacted by its omissions and would reasonably believe Haleon's false and misleading Maximum Strength Representations and omissions.

81.     Haleon intended that Plaintiffs and each of the other Illinois Subclass members would reasonably rely upon the material omissions concerning the true nature of the Products.

82.     Haleon's concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass members to be deceived about the true nature of the Products.

83.     Haleon's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

84.     Haleon's deceptive acts proximately caused actual injury and damage to Plaintiffs and the Illinois Subclass Members at the time of purchase.

85.     Plaintiffs and the Illinois Subclass Members would not have purchased, or would have paid less for, the Products but for Haleon's material misrepresentations as described in this Complaint.

86.     Haleon intended Plaintiffs and the Illinois Subclass members to rely on its deceptive acts when purchasing the Products.

**<u>COUNT III</u>**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(By Plaintiffs on Behalf of the Multi-State Consumer Protection Class)**

87.     Plaintiffs incorporate paragraphs 1-59 as if fully set forth herein.

88.     Plaintiffs bring this cause of action on behalf of themselves and the Multi-State Consumer Protection Class.

89.     Plaintiffs and Multi-State Consumer Protection Class members have been injured as a result of Haleon's violations of the state consumer protection statutes listed above in paragraph

31

51 and footnote 8, which also provide a basis for redress to Plaintiffs and Multi-State Consumer Class Members based on Haleon's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

90.     Haleon's conduct as alleged herein violates the consumer protection, unfair trade practices, and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

91.     Haleon violated the Multi-State Consumer Class states' consumer protection, unfair trade practices, and deceptive acts laws through its misleading and deceptive advertising that represented the Products were "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX." Haleon chose to package and market the Products in this way to impact consumer choices and gain market dominance, as it knew or should have known that all consumers who purchased the Products would be impacted by its omissions and would reasonably believe Haleon's false and misleading Maximum Strength Representations and omissions.

92.     Haleon's misrepresentations were material to Plaintiffs and Multi-State Consumer Class members' decision to purchase the Products or pay a premium for the Products.

93.     Haleon made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

94.     As a result of Haleon's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiffs and Multi-State Consumer Class members paid a premium for the Products.

95.     As a result of Haleon's violations, Haleon has been unjustly enriched.

96.     Pursuant to the alleged consumer protection, unfair trade practices, and deceptive acts laws, Plaintiffs and Multi-State Consumer Class members are entitled to recover

32

compensatory damages, restitution, punitive and special damages, including but not limited to statutory or treble damages, reasonable attorneys' fees, and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

<u>**COUNT IV**</u>
**UNJUST ENRICHMENT**
**(By Plaintiffs, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

97.     Plaintiffs reallege paragraphs 1-59 above as if fully set forth herein.

98.     Plaintiffs bring this cause of action on behalf of themselves, the Nationwide Class, and/or the Illinois Subclass. It is alleged it the alternative to the extent there is no adequate remedy at law.

99.     Plaintiffs and the putative class members conferred a benefit on Haleon when they purchased the Products. By its wrongful acts and omissions described herein, including selling the Products containing the "MAXIMUM STRENGTH," "MAX," and "EXPRESS MAX" representations, which did not conform to the promises or affirmations of fact made on the label, Haleon was unjustly enriched at the expense of Plaintiffs and the putative class members.

100.     Plaintiffs' and the putative class members' detriment and Haleon's enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

101.     Haleon has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and the putative class members under circumstances in which it would be unjust for Haleon to be permitted to retain the benefit. It would be inequitable for Haleon to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

102.     Haleon has been unjustly enriched in retaining the revenues derived from class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Haleon marketed, advertised, distributed, and sold the Products,

and Haleon misrepresented the nature of the products, misrepresented their benefits and attributes, and knowingly marketed and promoted the Products with Maximum Strength Representations, which caused injuries to Plaintiffs and the Classes because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

103.    Plaintiffs and the putative class members have been damaged as a direct and proximate result of Haleon's unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the misstatements regarding the strength of the Products' active ingredients.

104.    Haleon either knew or should have known that payments rendered by Plaintiffs and the class members were given and received with the expectation that the Maximum Strength Representations made by Haleon in advertising and on the Products' labels and packaging were true. It is inequitable for Haleon to retain the benefit of payments under these circumstances because the Maximum Strength Representations are not true.

105.    Plaintiffs and the putative class members are entitled to recover from Haleon all amounts wrongfully collected and improperly retained by Haleon.

106.    As a direct result of Haleon's wrongful conduct and unjust enrichment, Plaintiffs and the putative class members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Haleon for their inequitable and unlawful conduct.

**COUNT V**
**Breach of Express Warranty**
**(By Plaintiffs, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**

107.    Plaintiffs reallege paragraphs 1-59 above as if fully set forth herein.

108.    Plaintiffs and class members purchased the Products through Haleon's authorized

retailers.

109. Plaintiffs and class members formed a contract with Haleon at the time Plaintiffs and class members purchased the Products.

110. The terms of the contract include the promises and affirmations of fact made by Haleon on the Product packaging and through marketing and advertising, as described above.

111. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and class members.

112. Haleon made the representations described herein to induce Plaintiffs and class members to purchase the Products, and Plaintiffs and class members relied on the representations in purchasing the Products.

113. All conditions precedent to Haleon's liability under the above-referenced contract have been performed by Plaintiffs and the other class members.

114. Defendant thereby breached the following state warranty laws:

    a.     Code of Ala. § 7-2-313;

    b.     Alaska Stat. § 45.02.313;

    c.     A.R.S. § 47-2313;

    d.     A.C.A. § 4-2-313;

    e.     Cal. Comm. Code § 2313;

    f.     Colo. Rev. Stat. § 4-2-313;

    g.     Conn. Gen. Stat. § 42a-2-313;

    h.     6 Del. C. § 2-313;

    i.     D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x.      Miss. Code Ann. § 75-2-313;

y.      R.S. Mo. § 400.2-313;

z.      Mont. Code Anno. § 30-2-313;

aa.      Neb. Rev. Stat. § 2-313;

bb.      Nev. Rev. Stat. Ann. § 104.2313;

cc.      R.S.A. 382-A:2-313;

dd.      N.J. Stat. Ann. § 12A:2-313;

ee.      N.M. Stat. Ann. § 55-2-313;

ff.      N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     Il. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313; and

xx.     Wyo. Stat. § 34.1-2-313.

115.    In connection with its sale of the Products, Haleon, as the designer, manufacturer, marketer, distributor or seller, expressly warranted that the Products were maximum strength through its use of the Maximum Strength Representations described herein.

116.    The express warranties covering the Products were a material part of the bargain between Haleon and consumers. At the time it made these express warranties, Haleon knew

37

reasonable consumers were purchasing the Products because they believed they were maximum strength oral nasal decongestant products and pain reliever/fever reducers, as they were labeled and marketed.

117. Each of the Products have an identical or substantially identical product representation(s) as they each contain the term "MAXIMUM STRENGTH" or "MAX" or "ExpressMax" in their product name. Furthermore, the Products are marketed and advertised in an identical or substantially identical way.

118. Haleon breached its express warranties by selling the Products that were, in actuality, not maximum strength oral nasal decongestant products and pain relievers/fever reducers. Haleon breached the warranty because it sold the Products which it labeled and marketed using the Maximum Strength Representations despite the fact that stronger over-the-counter alternatives existed, which was known to Haleon and unknown to consumers at the time of sale.

119. Haleon further breached its express written warranties to Plaintiffs and class members in that the Products are incapable of fulfilling their promise to function as maximum strength oral nasal decongestant products and pain relievers/fever reducers at the time they leave the manufacturing plant and on the first day of purchase, and by failing to disclose and actively concealing the true benefits of the Products from consumers.

120. The Products that Plaintiffs and class members purchased are not maximum strength oral nasal decongestant products and pain reliever/fever reducers, and thus Plaintiffs and class members suffered the loss of the product, loss of use of the product, and loss of the benefit of their bargain. Haleon's warranty expressly applies to the original purchaser, creating privity between Haleon on the one hand, and Plaintiffs and class members on the other.

38

121.    Likewise, it was reasonably foreseeable that Plaintiffs and class members would be the intended beneficiaries of the Products, creating privity or an exception to any privity requirement. Plaintiffs and each of the class members are the intended beneficiaries of Haleon's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements provided by Haleon. Haleon's warranties were designed for and intended to benefit the consumer only and Plaintiffs and class members were the intended beneficiaries of the Products.

122.    Haleon has been provided sufficient notice of its breaches of the express warranties associated with the Products in a letter dated _____, 2023.

123.    As a direct and proximate result of Haleon's breach of its express warranties, Plaintiffs and class members.

<u>**COUNT VI**</u>
<u>**Breach of Implied Warranty**</u>
<u>**(By Plaintiffs, In the Alternative, and on Behalf of the Nationwide and/or Illinois Subclass)**</u>

124.    Plaintiffs reallege paragraphs 1-59 above as if fully set forth herein.

125.    Haleon is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the Products.

126.    The Products are goods within the relevant laws and Haleon knew or had reason to know of the specific use for which the Products, as goods, were purchased.

127.    The implied warranty of merchantability included with the sale of each Product means that Haleon warranted that the Products would be fit for the ordinary purposes for which the Products were used and sold, and were not otherwise injurious to consumers, that the Products would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Haleon. This implied warranty of

merchantability is part of the basis for the benefit of the bargain between Haleon, and Plaintiffs, and class members.

128.    Haleon breached the implied warranty of merchantability because the Products are not fit for their ordinary purpose as a maximum strength nasal decongestant and pain reliever/fever reducer. As further alleged herein, stronger over-the-counter alternatives existed, and therefore, there is a breach of the implied warranty of merchantability.

129.    Haleon's warranty expressly applies to the original purchaser and any succeeding owner of the Products, creating privity between Haleon on the one hand, and Plaintiffs and class members on the other.

130.    Nonetheless, privity is not required because Plaintiffs and class members are the intended beneficiaries of Haleon's warranties and its sale through retailers. Haleon's retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranty agreements. Haleon's warranties were designed for and intended to benefit the consumer only and Plaintiffs and class members were their intended beneficiaries.

131.    Likewise, it was reasonably foreseeable that Plaintiffs and class members would be the intended beneficiaries of the Products and warranties.

132.    Haleon impliedly warranted that the Products were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Products manufactured, supplied, distributed, and/or sold by Defendant were maximum strength nasal decongestants and pain relievers/fever reducers; and (ii) a warranty that the Products would be fit for their intended use while they were being used by consumers.

133.    Contrary to the applicable implied warranties, the Products, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and class

members with maximum strength nasal decongestants and pain reliever/fever reducers, as other, stronger alternatives are available with stronger active ingredients, such as pseudoephedrine and with higher acetaminophen dosages.

134.     Haleon breached the implied warranties because the Products were sold with the inability to provide Plaintiffs and class members with a maximum strength nasal decongestant and pain reliever/fever reducers, which substantially reduced and/or prevented the Products from functioning as maximum strength product.

135.     As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated members of the Classes, prays for relief and judgment, including entry of an order:

A.     Declaring that this action is properly maintained as a class action, certifying the proposed Classes, appointing as Class Representative and appointing Plaintiffs' counsel as Class Counsel;

B.     Directing that Haleon bear the costs of any notice sent to the Classes;

C.     Declaring that Haleon must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the sale of the Products, or order Haleon to make full restitution to Plaintiffs and the members of the Classes;

D.     Awarding restitution and other appropriate equitable relief;

E.     Granting an injunction against Haleon to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F.     Granting an Order requiring Haleon to fully and appropriately recall the Products and/or to remove the claims on its website and elsewhere, including "MAXIMUM STRENGTH" representations regarding the Products;

G.     Ordering a jury trial and damages according to proof;

H.     Awarding Plaintiffs and members of the Classes compensatory and punitive damages, or statutory damages, as provided by the applicable state consumer protection statutes invoked above;

I.     Enjoining Haleon from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

J.     Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Class(es);

K.     Awarding civil penalties, prejudgment interest, and punitive damages as permitted by law; and

L.     Ordering such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demands a trial by jury of all claims in this Complaint so triable.

Dated: December ___ , 2023          Respectfully submitted,

By: */s/ Gary Klinger*

Nick Suciu III
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
Email: nsuciu@milberg.com

Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

42

227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

Jeff Ostrow
Jonathan M. Streisfeld
Kristen Lake Cardoso
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: ostrow@kolawyers.com
        streisfeld@kolawyers.com
        cardoso@kolawyers.com

Melissa S. Weiner
Ryan J. Gott
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
Email: mweiner@pwfirm.com
        rgott@pwfirm.com

Erin Ruben
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Email: eruben@milberg.com

J. Hunter Bryson
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Telephone: (630) 796-0903
Email: hbryson@milberg.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on January 17, 2024 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


*/s/ Nick Suciu III*
Nick Suciu III